UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| **JOHN DOE, ET AL.** | : |
| | : |
| v. | : CIVIL NO. L-98-121 |
| | : |
| **BLUE CROSS BLUE SHIELD,** | : |
| **OF MARYLAND, INC.** | : |

### MEMORANDUM

Plaintiffs are three participants in a group health plan purchased by their employers from Defendant, Blue Cross Blue Shield, of Maryland, Inc.[1] They do not contend that they have ever been wrongfully denied benefits. They also do not contend that they are likely in the future to be denied benefits due them under their policies. Instead, their class action complaint contends that the market value of their policies has been diminished by the covert application of overly restrictive coverage criteria, applied on behalf of Blue Cross by its utilization review agent, Green Spring Health Services of Maryland.[2]

This case tests whether Plaintiffs have standing (i) under the general "cases or controversies" principle established by Article III, Section 2 of the Constitution, or (ii) under the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1169. Because the Court concludes that Plaintiffs lack standing under both grounds, the Court, by separate order, GRANTS Defendant's Motion to Dismiss and orders the case CLOSED.

---

[1] For simplicity's sake, Defendant will hereafter be referred to as "Blue Cross."

[2] Green Spring Health Services of Maryland will hereafter be referred to as "Green Spring."



**PROCEDURAL HISTORY**

This controversy began in 1997 when Plaintiffs' attorneys filed a complaint on behalf of a class consisting of individuals with Blue Cross coverage who had been denied mental health treatment based on Green Spring's allegedly over restrictive utilization review criteria. That suit was dismissed because the named plaintiff was not insured under an ERISA qualified plan. See Jane Doe v. Blue Cross Blue Shield, of Maryland, Inc., Case No. 1:97cv00770.

On January 14, 1998, Plaintiffs' attorneys initiated the instant suit by filing a complaint contesting the denial of mental health and substance abuse benefits, this time on behalf of two named plaintiffs and a class of persons with similar claims. Following substantial discovery and an amendment to the complaint, Plaintiffs' attorneys announced that they were abandoning all claims for denial of benefits and shifting to a "market value" theory of recovery. This theory argues that Blue Cross, by applying a set of clandestine, restrictive review criteria, has eroded the market value of the policies it has issued. As a remedy, Plaintiffs seek to require Blue Cross to disgorge, for a class of policyholders, the difference between the market value of the coverage Blue Cross should have been providing and what it has actually been providing.

Defendant filed its Motion to Dismiss on January 16, 2001. The motion was fully briefed by both sides. The Court held a lengthy motions hearing on September 14th that centered on a list of written questions generated by the Court. To further refine the issues, the Court submitted a second set of written questions on September 20th, which counsel answered in a telephone conference held on September 25th.

**BACKGROUND**

Blue Cross is a medical health insurance company. It issues policies to employers seeking health insurance coverage for their employees. While under some plans employers pay all of the expenses, the emerging norm is for employees to contribute to the cost of the coverage they receive. For many employers, the cost of their plans is calculated with reference to the claims experience of their employees in past years. The fewer the claims, the lower the premiums.

Each policy issued by Blue Cross is governed by a single, overarching Medical Necessity Definition that outlines when Blue Cross will authorize and pay for medical treatment. Blue Cross gives each subscriber literature explaining that under the "Blue Cross Medical Necessity Definition" coverage will be provided (1) consistent with diagnosis, treatment and condition, (2) only when required for other than convenience, (3) at the most "appropriate" level, and (4) according to "standards of good medical practice." The definition also states that inpatient care is not covered unless needed treatment cannot be provided safely on an outpatient basis.

Green Spring is a utilization review agent. Under a contract with Blue Cross, Green Spring makes coverage determinations. When an employee seeks treatment, a claim for benefits is submitted to Blue Cross. Blue Cross then refers the claim to Green Spring. Green Spring is supposed to evaluate these claims consistent with the Blue Cross Medical Necessity Definition.

While the Blue Cross Medical Necessity Definition provides general guidelines, it lacks the specificity necessary to determine whether particular cases of illness and injury will

be covered. In order to determine which claims will be paid and which will not, Green Spring has developed a more detailed Medical Necessity Definition. Green Spring's Medical Necessity Definition inserts terms not present in the Blue Cross Definition. For recurring injuries and illnesses, Green Spring has also developed specific sets of criteria governing what coverage and treatment modalities will be approved. Hereinafter, these condition-specific criteria are referred to as the "Green Spring Criteria."[3] The broad Blue Cross Medical Necessity Definition is published. The Green Spring Medical Necessity Definition and Criteria are not published, but are available upon request.

Plaintiffs do not take issue with the Blue Cross Medical Necessity Definition. The heart of Plaintiffs' Complaint is instead that Green Spring, in making the actual coverage determinations, fails to live up to Blue Cross' broad promises of coverage. Specifically, Plaintiffs allege that the Green Spring Medical Necessity Definition inserts restrictions not present in the Blue Cross definition, such as "efficient," "cost effective," and lowest "intensity of care." Second, and more importantly, Plaintiffs contend that the Green Spring Criteria authorizes mental health and substance abuse benefits levels below the "standards of good medical practice" promised by the Blue Cross Definition.

Blue Cross denies that there is any inconsistency between the broad language of its published medical necessity definition and either the unpublished Green Spring Definition or Criteria. If this case were to proceed to trial, Blue Cross would argue that the care it provides under the Green Spring Definition and Criteria lives up to the promise of "good medical

---

[3] Because the combined Green Spring Criteria are voluminous, they are not furnished to each participant. The criteria are, however, available upon request. Each participant is given a summary plan description ("SPD"), which describes his or her individual plan, how claims are made and decided, and outlines the participant's rights to appeal a denial of benefits.

4

practice."

When a participant in an ERISA qualified plan is denied benefits, he must first exhaust the plan's internal review procedures. If he remains unsatisfied, he can bring suit in federal court against the insurer. Ultimately, the inquiry in such a suit is whether the participant has received benefits in conformity with his plan. Not only does ERISA provide a forum for a participant who has been denied benefits, ERISA also provides for attorneys' fees and costs to be awarded to a successful litigant. See §502(g), 88 Stat. 892, as amended, 29 U.S.C. § 1132(g)(1).

Medical health insurance is a highly regulated field. In addition to complying with federal mandates,[4] Blue Cross and Green Spring must comply with Maryland law. Under Maryland law, Green Spring is required to obtain certification from the Maryland Insurance Commissioner as a utilization review agent. In order to obtain certification, Green Spring is required to file with the Insurance Commissioner the medical necessity criteria it utilizes in making benefits determinations and the Insurance Commissioner must approve the criteria. Blue Cross must also file with the Insurance Commissioner the rates it charges for its insurance plans and have them approved. If a subscriber contends that he has improperly been denied benefits he may, after exhausting an internal grievance process, apply to the Insurance Commissioner for relief. The Maryland Insurance Commissioner may hold hearings, issue cease and desist orders, and assess penalties for misconduct such as that alleged by Plaintiffs.[5]

---

[4] The highly "reticulated" ERISA statute and its attendant administrative regulations provide a comprehensive framework governing disclosure, the processing of benefits, internal appeals, and the right to sue. In the statute, as defendant points out, healthcare is a subject of intense Congressional scrutiny and Congress is even now considering legislation that would require additional disclosure of coverage criteria.

[5] The Insurance Commissioner's authority is laid out in a variety of sections in the Maryland Code, including §27-303, §27-304, §27-305, §1-301 and §27-103.

5

Under this framework, Plaintiffs in this case (or an employer believing it has been overcharged) could file a complaint with the Insurance Commissioner.

Because of ERISA preemption, it is unclear if any of the remedies provided under Maryland law are available. Nonetheless, Plaintiffs do not allege that they have filed a complaint with, or that their employers have filed a complaint with, the Maryland Insurance Commissioner seeking redress of the abuses alleged in this suit.

In its current version, Plaintiffs' Complaint consists of four counts. The counts revolve around the contention that Blue Cross represented one criteria as governing coverage and then applied, or had Green Spring apply on its behalf, a second, more restrictive definition and criteria that resulted in diminished coverage for plan participants.

Count I contends that Blue Cross violated ERISA's disclosure requirements by (a) failing to disclose the Green Spring Medical Necessity Definition and (b) failing to disclose the Green Spring Criteria.[6]

Count II alleges that Blue Cross breached its fiduciary duties under ERISA by announcing a liberal coverage definition, and then having Green Spring apply on its behalf a secret, more restrictive definition and criteria.[7]

Count III characterizes coverage itself as a benefit and contends that Defendant, by using the overly restrictive Green Spring Criteria, has violated ERISA by denying due benefits promised under the plans as advertised.

---

[6] Plaintiffs argue that these disclosure obligations arise under 29 U.S.C. §§ 1021, 1022, and 1024(b).

[7] The fiduciary duties in question are established by section 404(a) of ERISA. Section 404(a) obligates fiduciaries to discharge their duties in accordance with the documents and instruments governing the plan, to operate the plan solely in the interest of the plan participants and beneficiaries, and to exercise the care of an ordinarily prudent person in managing the plan. Plaintiffs also contend that Blue Cross had a fiduciary duty to (1) disclose material information about plan benefits to plan participants, and (2) disclose the Green Spring Criteria as required by section 104.

6

<u>Count IV</u> contends that Blue Cross failed to inform Plaintiffs of the specific reasons for the denials of their claims, as well as the procedures for appealing these denials. Plaintiffs argue that this failure deprived them of a full and fair review of their claims in violation of section 503(2) of ERISA.

Counts I and III seek "appropriate equitable relief" under section 502(a)(3) of ERISA. Count III also seeks relief under section 502(a)(1). Count II asserts a right to benefits due under section 502(a)(1)(B). Plaintiffs' Complaint does not specify what section Count IV seeks relief under.

**STANDARD OF REVIEW**

Ordinarily, a Complaint should not be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of its claim which entitle it to relief. <u>See</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>Labram v. Havel</u>, 43 F.3d 918, 920 (4th Cir. 1995). The liberal pleading requirements of Rule 8(a) demand only a "short and plain" statement of the claim. In evaluating such a claim, the Court must accept as true all well-pleaded allegations of fact and view them in the light most favorable to the plaintiff. <u>See</u> <u>Jenkins v. McKeithen</u>, 395 U.S. 411, 421-22 (1969). In essence, the legal theory articulated, or even suggested, by the non-moving party must be one that could not be the basis for a ruling in that party's favor.

**ANALYSIS**

The overarching question presented by this case is whether Plaintiffs have standing (i) under the general "cases or controversies" principle established by Article III, Section 2 of the Constitution, or (ii) under ERISA. Because the Court concludes that Plaintiffs lack standing

under both grounds, the Court GRANTS Defendants' Motion to Dismiss and orders the case CLOSED.

## PLAINTIFFS DO NOT HAVE STANDING UNDER ARTICLE III

Under Article III, Section 2 of the Constitution, federal jurisdiction extends only to "cases or controversies." Plaintiffs bear the burden of alleging: (1) a concrete and actual or imminent "injury in fact;" (2) causation between the plaintiff's injury and the defendant's conduct; and (3) a likelihood that the requested relief will redress the alleged injury. See Lujan v. Defenders of Wildlife, 504 U.S. 550, 560 (1992). "Pleadings must be something more than an ingenious academic exercise in the conceivable." United States v. Students Challenging Regulatory Agency Procedures, et al., 412 U.S. 669, 688 (1973). Plaintiffs must allege that they have been harmed in fact, not that they "can imagine circumstances in which [they] could be affected." Id. The Court finds that Plaintiffs have not alleged a concrete and actual or imminent "injury in fact." See Lujan, 504 U.S. at 560 (1992).[8] Accordingly, their claim fails for lack of standing under Article III.

Maio v. Aetna, Inc., 221 F.3d 472 (3d Cir. 2000), and In re Managed Care Litigation, 150 F.Supp. 2d 1330 (S.D.Fla. 2001), provide competing models for evaluating the standing issues present in this case. In both cases, the plaintiffs alleged that their insurers had induced them to enroll in health care plans by misrepresenting the extent of the coverage that would be provided. Both sets of plaintiffs argued that their injury was the diminishment in market value their plans had suffered as a result of covert, overly restrictive coverage criteria.

---

[8] It is also questionable whether the second and third elements of the Lujan test, causation and redressability, are satisfied. As discussed below, Plaintiffs do not allege reliance or prejudice as required by established ERISA case law. Also, because it was Plaintiffs' employers who negotiated the insurance policies in question, it is unclear whether a cash award to Plaintiffs would redress the alleged injury.

Although these cases involved the stringent standing requirements of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, the Court finds that their analyses are instructive as regards Plaintiffs' standing under ERISA.[9]

In a closely reasoned twenty eight page opinion, authored by Circuit Judge Morton I. Greenberg, the Maio court concluded that claims for coverage revolve around discrete medical facts that must be analyzed individually. Wholesale challenges to an HMO's coverage criteria, untethered from a discrete set of facts, are best undertaken by the legislative branch, which has broad fact finding powers and policy making capabilities. Moreover, the Maio court found that the plaintiffs' injury rested solely on "factual speculation" as to whether their contracts would have been breached had they requested benefits, and therefore presented daunting analytical problems and an unworkable proof structure.[10]

The Third Circuit viewed its holding as consistent with the recent Supreme Court case of Pegram v. Hedrich, 528 U.S. 211 (2000). In Pegram, the Supreme Court warned that the courts are ill-equipped to entertain wholesale attacks on the structure and cost-containment practices of Health Maintenance Organizations. Citing Pegram as direct precedent, the Maio court upheld the dismissal of a "market value" class action complaint because the plaintiffs lacked standing.

Apart from the practical reasons why standing should be denied, the Third Circuit

---

[9] In order to establish standing, RICO plaintiffs must allege injury to their business or property. See Maio 221 F.3d at 473. As a result, RICO plaintiffs face a more stringent burden than ERISA plaintiffs, who are free to claim a wider range of actionable injuries. Maio's reasoning is still applicable, however. Plaintiffs' theory argues that their injury is the diminished value of their insurance. Maio's holding revolved around the notion that insurance is a contract and, therefore, injuries resulting from the failure to abide by the insurance contract are governed by contract law. Id. at 489; see also Md. Ins. Code Ann. §1-101(t) (insurance is a "contract to indemnify or to pay a specified or determinable amount of benefit on the occurrence of a determinable contingency").

[10] A legislature has broad fact-finding powers. The Maio court observed that the courts, lacking these powers, would be unable to adequately analyze the plaintiffs' claim.

9

pointed out a technical distinction between contractual rights and property rights, finding that insurance is not a tangible property interest subject to diminishment like "a plot of land or a diamond necklace." Maio, 221 F.3d at 488.  Accordingly, the Maio court dismissed the complaint because it failed to allege that the insurers had breached the insurance contracts by refusing to provide promised benefits. Id.  As the Maio court noted, of course, individuals still have the option of filing individual denial of benefits claims under ERISA.

A case from the Southern District of Florida reached the opposite conclusion. In contrast to Maio's contract-based approach, In re Managed Care Litigation characterized the plaintiffs' injury as being more akin to a tort. 150 F.Supp. 2d at 1339.  That court found that the plaintiffs were "fraudulently induced to purchase insurance coverage with explicit rights to coverage which the Defendants never intended to honor, and therefore suffered a tortuous injury at the time they enrolled in the Defendants' plans." Id.  The opinion did not address the workability of the proof structure inherent in the plaintiffs' case, however.

This Court finds the reasoning of the Third Circuit persuasive for the following reasons:

### 1. There Is No Reported Case In Which ERISA Plaintiffs Have Been Granted Standing Under A "Diminished Market Value Theory"[11]

Plaintiffs can point to no ERISA case in which standing was granted based on the "market value" injury that they allege.  To the contrary, ERISA case law consistently has tied the issue of standing to the denial of specific benefits.  For example, in Stephenson v.

---

[11] In re Managed Care Litigation concluded that the plaintiffs had standing under RICO.  The court did not specifically address whether the plaintiffs had standing under ERISA.  Based upon its thinking, however, it is likely that the court would have found that Plaintiffs have standing under ERISA.

Holland, 102 F. Supp. 2d 686 (S.D.W.V. 2000), the plaintiff alleged that the plan's trustees had violated their statutory ERISA obligations by refusing his request for additional information concerning the denial of his benefits claim. Under a market value theory, Stephenson should have been granted standing if his allegations were true, because the market value of his policy would have been diminished by the trustees' failure to meet their statutory obligations. The court, however, declined to grant standing because the plaintiff was not appealing the actual denial of his benefits. Id. ("Only judicial analysis of the facts of Stephenson's case and the merits of the denial will uncover the standards the Fund applied and determine whether Stephenson's benefit denial was wrongful."). In the instant case, therefore, Plaintiffs are asking this Court to recognize a new form of ERISA injury, unprecedented in ERISA case law.

## 2. There Is A Consistent Reluctance To Recognize New Causes Of Action Under ERISA

ERISA is a "comprehensive and reticulated statute," enforced by a series of interlocking and interdependent remedies. Nachman Corp. v. Pension Benefit Guaranty Corporation, 446 U.S. 359, 361 (1980). The existing ERISA enforcement scheme is the result of "an enormously complex and detailed statute that resolved innumerable disputes between powerful competing interests--not all in favor of potential plaintiffs." Mertens v. Hewitt Associates, 508 U.S. 248, 262 (1993).[12] As a result, the courts have "repeatedly declined invitations by plan participants and beneficiaries to extend benefits and remedies not specifically authorized by the statutory text." Varity Corp. v. Howe, 516 U.S. 489, 517

---

[12] It is noteworthy that Congress is currently considering legislation that would expand the disclosure obligations of insurers and thereby address many of the complaints alleged by Plaintiffs.

(1996). In a similar vein, the Supreme Court has warned that it is the province of the legislative branch, and not the courts, to delve into the means by which insurers balance the competing goals of providing medical care and, at the same time, minimizing costs. See, e.g., Pegram, 528 U.S. at 234 (allowing "wholesale attacks on existing HMOs solely because of their structure, untethered to claims of concrete harm" would be contrary to Congressional policy).

### 3. The Existing ERISA Enforcement Scheme Already Provides Remedies For The Injuries Alleged by Plaintiffs

At base, the value of any insurance policy lies in receiving benefits for covered claims. This case, therefore, calls into question whether a class action lawsuit is required to preserve for Blue Cross subscribers the market value of their policies. The answer is that a class action lawsuit is not required.

Under ERISA, participants have a right to an internal appeals process to contest the denial of specific claims. If they remain unsatisfied, participants may file suit in federal court.[13] By permitting the court to award attorney's fees to a successful claimant, ERISA has created a strong incentive for attorneys to handle these cases. The attorneys' fee provision also undercuts one of the prime reasons for permitting a class action (with all of a class action's attendant complexities), mainly that individuals with claims too small to justify individual lawsuits must be allowed to aggregate their claims. See Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 147 (1985) ("Finally, in answer to a possible concern that attorney's fees might present a barrier to maintenance of suits for small claims, thereby

---

[13] They also may have had the opportunity to petition the Maryland Insurance Commissioner for relief.

risking underenforcement of beneficiaries' statutory rights, it should be noted that ERISA authorizes the award of attorney's fees.").

### 4. Plaintiffs' Proposed Proof Structure Is Unworkable

Plaintiffs contend that Blue Cross and Green Spring have used overly restrictive criteria to deny claims that should have been granted. This raises the question why Plaintiffs are not pursuing a class action on behalf of individuals whose claims have been improperly denied. The answer is that individual coverage disputes are so grounded in their particular facts that class action treatment is impractical.

In deciding whether a case can realistically be maintained as a class action, the court must look at the proof the plaintiffs would present at trial and ask whether the proof is sufficiently concrete to decide the issues. One possibility would be for Plaintiffs to present the case histories of a group of claimants whose claims had been denied. This would prove little, because Defendant would present the case histories of a group of claimants whose claims had been approved. The case would degenerate into a medical battle over the proper handling of these discrete cases and would prove little, if anything, about the overriding class issues.

Recognizing this, Plaintiffs' counsel, in response to a written question from the Court, stated that he could prove his case without resort to individual case histories. Counsel enumerated the categories of proof that Plaintiffs would offer, including (i) testimony that inpatient drug treatment programs have shut down for lack of paying clients, (ii) a decrease in the number of in-patient treatment days authorized by Green Spring, and (iii) an analysis of the Green Spring Criteria by health experts, who would testify that, as written, they do not

live up the Blue Cross's promise of "standards of good medical practice." Green Spring would undoubtedly respond with its own experts and such a trial would degenerate into a battle of semantics.

The Court blanches at the speculative nature of this type of proof, which would require a long and contentious trial that would yield little concrete information from which the jury could decide the case. Plaintiffs' complaint is that Green Spring has denied claims that it should have approved. The only way to test this assertion is to look at the individual claims themselves; this cannot be done practically in a class action format.

### 5. Plaintiffs' Alleged Injury Sounds More Appropriately In Contract Law, Which Requires A Breach To Be Actionable

A health insurance policy is a contract, under which the insurer agrees in writing to provide benefits according to the terms of the policy. That contract is breached, and the participant has an accrued cause of action, when the insurer wrongfully declines to approve treatment or to pay a claim.

Plaintiffs' theory is that Blue Cross, if called upon to perform, may at some indefinite future date deny benefits pursuant to a restrictive reading of the contract. Plaintiffs contend that this potentiality diminishes the present value of their policies. Contract law, however, does not recognize a cause of action based on the theory that the market value of the contract itself has been diminished because one side may breach it in the future. See Maio, 221 F.3d at 494.

The Fourth Circuit Court of Appeals rejected the diminished market value theory when it affirmed the dismissal of the complaint in Carlson v. General Motors Corp., 883 F.2d

287 (4th Cir. 1989). In <u>Carlson</u>, the plaintiffs sought to certify a class of car owners who "did not specifically allege that their diesel vehicles were defective, but instead only that the 'poor reputation' of GM's diesel products [due to undisclosed engine defects] resulted in compensable losses of 'resale' value." <u>Id.</u> At 289. The plaintiffs alleged that the latent defects in GM vehicles violated their cars' implied warranties of merchantability, even if their cars had no mechanical problems. The court held that, "in this case, GM warranted that the cars it manufactured would be fit for driving and transportation. GM did not warrant to each purchaser that every other purchaser's car would be fit." <u>Id.</u> at 291. Thus, the proper reference point was a car owned by an individual plaintiff and not cars owned by anyone else. As a result, the court found that the plaintiffs had brought a claim more appropriately analyzed "outside the context of rulings on Rule 23 motions for class certification." <u>Id.</u> At 297.

Plaintiffs' complaint is properly analyzed under contract rather than tort law. It is established law that "[w]hen the injury is only the economic loss to the subject of the contract itself, the action sounds in contract alone." <u>Interstate Contracting Corp., v. Mine Service, Inc.</u>, 2000 WL 1281198 (N.D. Tex. 2000). But, even if Plaintiffs' complaint were analyzed under tort law as a fraudulent inducement to contract, their claims are not ripe. The promisee does not suffer an injury necessary to trigger a fraud claim based on fraudulent inducement unless and until the promisor actually breaches the contract by failing to perform. <u>See</u> <u>Daily Variety, LTD., v. Term Leasing, Inc.</u>, 1989 WL 58029 (S.D.N.Y. 1989).

> Until the promisor actually breaches the contract, the promisee does not suffer the injury necessary to establish a fraud claim based on fraudulent inducement to contract, because the injury to the promisee in such a fraud claim stems from the

15

failure of the plaintiff to fulfill the contract. Id.

Plaintiffs' claims, therefore, fail for lack of Article III standing because the complaint does not allege a concrete and actual or imminent "injury in fact." Lujan, 504 U.S. at 560 (1992). Additionally, because particularized proof, grounded in the denial of individual claims, is required to frame the issues presented by the complaint, class treatment is inappropriate. Accordingly, the complaint must be dismissed under FRCP 12(b)(1) because this Court has no jurisdiction to entertain it. The Court would also decline to certify a class.

## PLAINTIFFS DO NOT HAVE STANDING UNDER ERISA

The standing issue is outcome determinative and the Court need not address the specific ERISA issues. Nonetheless, even a cursory overview of the ERISA issues shows that the viability of the complaint under that statute is problematic.

**Count III alleges a denial of coverage-benefits under section 502(a)(1)(B).** Under established law such claims typically arise only when benefits are requested and formally denied. See Rodriguez v. MEBA Pension Trust, 872 F.2d 69, 72 (4th Cir. 1989). In Rodriguez, the Fourth Circuit Court of Appeals wrote that tethering a claim to a specific denial avoids "burden[ing] the judicial system with multiple and premature actions." Id. at 72. There is, therefore, no precedent under the section 502(a)(1)(B) case law for the plaintiffs' market value theory of recovery.[14]

**Counts I and VI allege that Blue Cross failed to provide ERISA required claims**

---

[14] Plaintiffs paint Cotter v. Eastern Conference of Teamsters Retirement Plan, 898 F.2d 424, 426, 429 (4th Cir. 1990), as an exception to Rodriguez. Although Cotter is a complicated case with an unusual fact pattern, the plaintiff was nonetheless suing for individual benefits that he claimed he should have received in the past. In the instant case, Plaintiffs are not requesting benefits that they should have received in the past. Thus, Cotter offers no support to Plaintiffs.

**procedures and failed to disclose the allegedly restrictive criteria.** These counts founder on the Article III standing requirement. They also founder under ERISA standing requirements because the plaintiffs cannot establish reliance and prejudice. Here, Plaintiffs do not allege either reliance or prejudice because they did not submit claims for benefits, or have those claims denied, or suffer confusion about claims procedures.

A case largely on point is Pierce v. Security Trust Life Ins. Co., 979 F.2d 23, 30 (4th Cir. 1992). In Pierce, the plaintiff claimed that he had been misled and injured by an employer's failure to disclose a provision reserving the right unilaterally to terminate or alter the plaintiff's insurance plan. The Fourth Circuit Court of Appeals found that reliance and prejudice were absent unless and until the disputed contract provision was actually invoked against the plaintiff. Id. at 30; see also Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 238 (4th Cir. 1997) (requiring proof of causal connection between defects in procedures and denial of claim).

Like the plaintiff in Pierce, the instant class action plaintiffs cannot establish either reliance or prejudice until one of their claims has actually been denied.

**Count II contends that Blue Cross violated its fiduciary duties by failing to disclose that it never intended to deliver the level of care advertised in its misleading literature.** Arguing that Blue Cross has been unjustly enriched by this breach, Plaintiffs seek disgorgement under sections 502(a)(1) and 502(a)(3).

A section 502(a)(1) claim must provide relief to the plan as a whole as opposed to individual beneficiaries. See Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 146 (1985); Coyne & Delany Co. v. Blue Cross and Blue Shield, 102 F.3d 712, 714 (4th Cir. 1996). Section 502(a)(3) is a "catchall" provision that provides for "appropriate equitable relief." See

Varity Corp. v. Howe, 516 U.S. 489 (1996). The modifier "appropriate" has been held to limit the remedies available under Section 502(a)(3) to "injuries caused by violations that §502 does not elsewhere remedy." Id.; See also Coyne & Delaney Co., 103 F.3d at 716.

Plaintiffs' argue that Blue Cross should be required to provide relief to their plan by funding a constructive trust. This is a creative, but flawed, solution for avoiding section 502(a)(1)'s prohibition against providing relief to individual beneficiaries. Plaintiffs make no attempt to explain how the trust would function, how the funds would be distributed, or how the creation of such a trust would remedy Plaintiffs' alleged injury.

Section 502(a)(1) is typically applied in instances where a plan has been underfunded due to the defendant's misconduct. The remedy in such a case is an order requiring the defendant to infuse money into the plan. Such a remedy accrues to the plan as a whole, and not to individual members. Despite Plaintiffs' attempt to fashion a class wide injury, the essential injury stated in the Complaint is that individual participants have not received the individual benefits to which they were entitled. If Plaintiffs' theory is accepted, individualized relief would be appropriate. Thus, section 502(a)(1) is inapplicable.

Plaintiffs' argument for relief under section 502(a)(3) is also unpersuasive. Equitable relief under Section 502(a)(3) is only "appropriate" in cases where a remedy is not provided elsewhere in section 502. See Coyne & Delaney Co., 103 F.3d at 716. Plaintiffs have the ability, however, to assert their individual rights to coverage-benefits under section 502(a)(1)(B). Thus, section 502(a)(3) is not needed to redress an injury that would otherwise go unremedied.

Additionally, equity requires that restitution be calibrated to the amount of unjust enrichment. See Restatement of Law Third, Restitution and Unjust Enrichment, Discussion

Draft, §2, Comment D. Such an analysis would be exceedingly difficult given the nature of Plaintiffs' Complaint. Plaintiffs' plans were negotiated by their employers. Plaintiffs' contributed to their plans both by making cash payments and by providing labor to their employers. Employers frequently negotiate their premiums based on the claims experience of past years. As a result, the "overcharge" alleged by Plaintiffs may have already been addressed, at least in part, by decreases in premiums charged to their employers in subsequent years. The market analysis required to sort through such factors and determine the amount of restitution owed to each individual plaintiff is daunting. ERISA case law consistently warns against engaging in abstract calculations of this nature, especially when there are alternative remedies available.

Because Plaintiffs lack standing, the Court will, by separate Order, GRANT Defendant's Motion to Dismiss and DIRECT the CLERK to CLOSE the CASE.

It is so ORDERED this _28TH_ day of September, 2001.

*[signature]*

Benson Everett Legg
United States District Judge